DowNEy, Judge,
delivered the opinion of the court:
The plaintiff sues to recover the reasonable value of the use of Pier 8 of the Bush Terminal from midnight of January 31, 1918, until midnight of September 30, 1919. The Bush Terminal Co. of New York owned and operated what is known as the Bush Terminal, in the Borough of Brooklyn, and which for the most part consisted of a series of eight piers, numbered from 1 to 8, inclusive, and more than a hundred warehouses, with 30 miles of railroad tracks extending from the main-line railroads to said warehouses and onto said piers.
*245 In September of 1916 the plaintiff company had entered into a lease with the Bush Terminal Co. for the use of Pier 8 for the period of three years, beginning on the 1st day of October, 1916, at an annual rental of $60,000, payable in equal monthly installments, and was in possession of said pier under said lease from October 1, 1916, until August 24, 191T, from which last-named time until February 11, 1919, the pier was in possession of John S. Sheppard, jr., a temporary receiver for the business of the plaintiff company appointed by the judge of the District Court of the United States for the Southern District of New York.
On December 81, 1917, by an order of the Secretary of War of that date, the United States took possession of the Bush Terminal properties above referred to, and on the 3d of January, 1918, the Acting Quartermaster General served formal notice on the Bush Terminal Co. that it had requisitioned the Bush Terminal properties described in an attached schedule, which included all of the said Bush Terminal properties in the borough of Brooklyn, consisting of piers, warehouses, and appurtenant railroad facilities.
On the 14th day of January, 1918, by a notice dated January 1,1918, but served on said January 14, the receiver of the plaintiff company was notified that by authority of the President of the United States the Bush Terminal had been requisitioned for the use of the embarkation service of the United States Army, and possession thereof had passed to the United States, and that it was necessary that the Government have full possession of these premises at the earliest date possible, and he was requested to communicate with the officer of the United States Army in charge of the division of docks, wharves, and terminals and make arrangements, for the vacation of the pier.
The lease, the order of the Secretary of War, the notice to* the Bush Terminal Co., and the notice to the receiver of the plaintiff company appear in full in the findings, and may be referred to herein to the extent necessary in the discussion of the questions involved without quoting.
The receiver of the plaintiff company had paid to the Bush Terminal Co. the rental provided in the lease for the month of January, 1918, and, there being certain commit *246 ments involving tlie use of tlie dock during that month, for the purpose of unloading a vessel, it was agreed between the receiver and the officer in charge of docks, wharves, and terminals that the receiver should vacate and surrender possession of Pier 8 to the United States at midnight of January 31, 1918, which he did. Such revenues as accrued from the use of the pier during the month of J anuary were retained by the receiver, but the unloading of the vessel which had docked at Pier 8 during the latter part of J anuary, not having been completed when the pier was turned over to the possession of the United States, the receiver, by virtue of an arrangement between him and the officer in charge of docks, collected the portion of the revenues arising .from such use of the pier during the month of February, together with revenues arising during the month of January, and paid over to the United States such revenues accruing during February. The pier was vacated by the United States and surrendered to the Bush Terminal Co. at midnight of April 30, 1919.
When the Bush Terminal properties were thus requisitioned by the United States, a part thereof were in the possession of the Bush Terminal Co. unleased, but many parts thereof, including piers and warehouses and pier and warehouse space, were in the possession of tenants of the Bush Terminal Co. A board of appraisers was appointed to determine the compensation to be paid by the United States to the Bush Terminal Co. for the use of the Bush Terminal properties, and they made a report, which is set out in the findings, in which they determined not only the compensation to be paid to the Bush Terminal Co. for the portions of the properties not under lease, but also determined by items the payments to be made to the Bush Terminal Co. on account of the several items in the possession of tenants .at the time the properties were taken over, some of whom for various times were permitted to remain in possession, in connection with which they determined the rental value ■of Pier 8 to be $2,325 per month, and as a part of the compensation paid the Bush Terminal Co. by the United States for the use of its properties during the period of Government occupancy that company was paid for Pier 8 at said *247 rate of $2,325 per month. Subsequent to January of 1918 neither the receiver for the plaintiff company nor the plaintiff company itself paid any rent for said pier.
Soon after the taking over of the terminal properties by the United States the United States paid to the Bush Terminal Co. $1,000,000 to be applied upon the compensation for the use of the properties taken, or upon the purchase price of the properties in the event that the United States should determine prior to July 1, 1918, to acquire absolute title thereto, as indicated in the instrument of appropriation, and in the determination by the board of appraisers as to the compensation due the Bush Terminal Co. for the first year of the occupancy of its properties by the United States this $1,000,000 was credited as an advance payment upon the compensation determined, and the award made by this board of appraisers was accepted by the Bush Terminal Co. and payment thereunder authorized by the Secretary of War, and made. This award as made and accepted by the Bush Terminal Co. covered the use by the United States of all the properties taken, whether in the possession of the Bush Terminal Co. unleased or in the possession of tenants. When the United States surrendered the possession of Pier 8 to the Bush Terminal Co., that company executed to the United States a release “ from any and all claims from suits, debts, obligations, and liabilities of whatsoever kind and nature which may arise or may have arisen by reason of occupation of said premises by the United States,” said release appearing in full in the findings. There are other facts pertinent to the questions involved which are set out in the findings and reference may be made thereto as occasion requires.
Counsel on both sides of the case devote their attention largely to a discussion of the question of fact as to just compensation in addition to which the defendant raises a question as to the jurisdiction of the court, predicated upon the statute involved.
The jurisdictional question raised is necessarily for determination and naturally has priority; but assuming it determined that this court has jurisdiction in this respect, it does not follow that only the question as to the amount of com *248 pensation remains, for, preceding that question, there is for determination the basic question as to whether there is any right of recovery in the plaintiff, and upon determination of that question another jurisdictional question may arise.
Upon the jurisdictional question raised it is, of course, to* be conceded that if the case is under section 10 of the Lever-Act, 40 Stat. 279, as contended, this court is without jurisdiction. United States v. Pfistch, 256 U. S. 547. But we do not so regard it, and neither has the plaintiff so predicated its case., The plaintiff declares upon a requisitioning of its pier, the implied contract arising therefrom, and the jurisdiction of this court under section 145 of the Judicial Code.,
The general order under which the United States took possession of the properties of the Bush Terminal Co. declared that such action was taken pursuant to the authority-vested in the President by the act of Congress approved August 29, 1916, 39 Stat. 645, and section 10 of the Lever Act, and the character of the properties taken indicates clearly the reason for the reference to the two acts as the authority-for the taking.
The act of August 29,1916, authorized the taking of “ any system or systems of transportation or any part thereof and to utilize the same to- the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material, and equipment,” etc... while section 10 of the Lever Act applied, so far at least as this case is concerned, to “ storage facilities.” The properties, of the Bush Terminal which were taken consisted of piers in New York Harbor, railroad tracks leading thereto and thereon, and warehouses. It seems apparent therefore that the recital of the two acts was because of the application of' one to the piers as parts of a transportation system and the-other to the warehouses as “ storage facilities,” and it is a matter of common knowledge that these piers were in fact very largely used “ for the transfer or transportation of' troops, war materials, and equipment” during the World. War. They and the railroad tracks appurtenant thereto-were “ transportation ” and not “ storage ” facilities, and this conclusion determines the jurisdictional question raised..
*249 Assuming the correctness of this conclusion, the case presented is one involving a taking of property under authority of the act of August 29, 1916, which contains no provisions as to compensation such as are found in section 10 of the Lever Act, with a right to recover just compensation as upon an implied contract if upon the facts such an implication arises, and the jurisdiction of this court is, because of its jurisdiction under section 145 of the Judicial Code, of actions founded “ upon any contract, express or implied.”
In this view of the case we have for consideration the very important question whether under the facts found there was such a taking from the plaintiff of its propei'ty as gives rise to an implied promise to pay the plaintiff therefor, and upon this question, in view of the status of thei plaintiff as a tenant, we are, so far as our researches have developed, without direct authority, although established fundamental principles seem applicable.
It appears that included in the Bush Terminal properties • which were taken over by the United States there were eight piers, of which No. 8, the one here involved, was the last built and much smaller than the others, and a considerable number of large warehouses, all of such extent that aside from the parts of these properties which were in possession of the Bush Terminal Co. and not under lease and which, judged by rental value, we may infer from the record constituted more than half of the properties, there were approximately 40 tenants occupying such parts of the properties as to command a rental of more than $60,000 per month. It was against all of these vast properties collectively that the United States proceeded under the authority vested in the President, and its procedure with reference thereto was against the Bush Terminal Co.
Its action against the plaintiff was not by way of a commandeering order against it but was a notice to it that “ the Bush Terminal has this day been requisitioned for the use of the embarkation service of the United States Army,” followed by a suggestion as to a desire not to inconvenience present occupants and a direction as to arrangements for the consummation of the vacation of the pier. And the pier in question was a part of the “ Bush Terminal ” which it was *250 said had been requisitioned. The service of the notice was acknowledged by the receiver of the plaintiff company, who had paid rent for the pier for- the month of January, and very amicable negotiations between him and the officer in charge, because of commitments for the use of the dock during that month, resulted in an agreement that the receiver might retain possession until January 31 and turn the pier over at midnight of that day, which he did without objection or protest and from that time on paid no rent.
When the United States commandeered the Bush Terminal, including Pier 8, and notified the plaintiff receiver of that fact and that he must arrange to vacate, the result of its action was to take the possession of the pier, which was then in the receiver and, in practical effect, to deprive the receiver of that leasehold interest therein which he then held, and if a lease is property, which it must be conceded to be, and may therefore be the subject matter of a “taking,” it is rather natural than otherwise to conclude that in this instance the United States “ took ” from the plaintiff’s receiver a leasehold interest in the pier and must make just compensation to the plaintiff therefor. But this conclusion is one of natural matter of fact import rather than of legal derivation, since, as it seems to us, some of the elements of a “ taking,” out of which an implied contract to pay arises, are lacking.
It is not every actual taking or using of the property of another which constitutes such a “ taking ” as gives rise, coupled with the applicable provision of the fifth amendment, to the implied contract to pay which must be the basis of a recovery in this court.
In Tempel v. United States, 248 U. S. 121, the United States assumed that it had the right to submerge and navigate over and further dredge the plaintiff’s land, which facts, it was held, precluded the implication of a promise to pay, although the United States did in fact dredge and submerge and in fact take plaintiff’s land.
In Hill v. United States, 149 U. S. 593, the United States asserted a right to the use of the land in question as against the plaintiff or any other person, and it was held that the action should have been dismissed for want of jurisdiction. *251 And this case was said to be governed by Langford's case, 101 U. S. 341, in which case the United States, in taking possession of the property claimed by the plaintiff, asserted its own title and it was held that no implied contract to pay could arise.
Since these cases and others along the same line touch necessarily, as we construe them, upon a requisite element of an implied contract, it is not inappropriate, as reflecting historically the jurisdiction of this court and the later holdings after its enlargement, to say that when the Langford case was decided this court’s jurisdiction, defined by section 1059, Revised Statutes, was founded upon “ any law of Congress or upon any regulation of an executive department or upon any contract, express or implied,” and that by the • act of March 3, 1887, 24 Stat. 505, which became practically section 145 of the Judicial -Code, there was added to its jurisdiction “ claims founded upon the Constitution of the United States.” But notwithstanding this addition and the provision of the fifth amendment as to just compensation, and the suggestion in a dissenting opinion in the Hill case that by reason- of the provisions of that act the jurisdiction of this court was as of an action founded on the Constitution, the jurisdiction of this court has consistently since that time in this class of cases been held to be a jurisdiction of cases founded upon an implied contract. This is material, since if the facts do not justify the implication of a legal contract to pay, this court is without jurisdiction.
The cases cited above are illustrative of the fatality of the absence of any necessary element of an implied contract to pay, the absence in those cases of any intention to take the property of the claimants even though it was actually taken. An intention to take was wholly inconsistent with the asserted right. Such an intention may, of course, be implied rather than expressed, as, for example, in the cases with which we have had to do where the United States by the erection of dams in streams has permanently overflowed lands and the intention to take is to be inferred because it was the necessary and easily to be ascertained result of the act done and must have been anticipated, but likewise may the absence of any essential element of an implied contract *252 be a matter of justified inference from the circumstances of the case. In Horstman Co. and Natron Soda Co. v. United States, 257 U. S. 138 at 146, referring to' the necessity for the implication of a contract to pay in order to bind the Government, it is said, “ but the circumstances may rebut that implication.” See Ball Engineering Co. v. White & Co., 250 U. S. 46-57.
Consideration of this case is necessarily a reminder of the well-known and urgent governmental needs at the time involved. They were the needs of a great emergency. Ships were being procured for the transportation of troops and supplies, but adequate and convenient embarkation facilities were necessary, and they were best to be had by utilizing the great Bush Terminal. Obstacles to a renting presented themselves, and under the authority vested in the President a general commandeering order was issued by the Secretary of War, taking over for governmental purposes in connection with the transportation of troops and supplies this great system of docks and warehouses, notice to that effect being served on the Bush Terminal Co. Many docks and parts of docks, warehouses, and parts of warehouses were in the possession of tenants.
Could it be conceived that in these circumstances the Government must meet its emergency by requisitioning berthing-space for a ship from this tenant and for another ship from another tenant, and warehouse space from various tenants? Rather did it do the natural, the efficient, the necessary thing. It requisitioned the Bush Terminal from its owner, the Bush Terminal Co. And it took it not simply for temporary use but for such use, coupled with a right to determine within a given time whether it would take over the title thereto.
It served no instrument of requisition, either in form or effect, upon the plaintiff, but, on the contrary, it notified the plaintiff that it had requisitioned the Bush Terminal and that possession thereof had passed to the United States, followed by suggestions as to the vacation of Pier 8, and later by negotiations resulting in the fixing, by agreement, of a time when the plaintiff’s receiver would vacate, which he did at the time agreed upon without objection or protest.
*253 It would seem thus that even though the action of the United States served to deprive the plaintiff of the possession of the pier and to take over a use thereof which was the equivalent of that enjoyed by the plaintiff under its lease, there was no action directed against the plaintiff in this respect, but the United States proceeded, so far as the plaintiff was concerned, upon the theory that it had already acquired, by virtue of its requisitioning of the Bush Terminal from the Bush Terminal Coq the right to the use of Pier 8 in common with all the other properties taken. And if in fact the United States thus invaded the rights of the plaintiff, is it not, as was said in the Kelly case, 243 U. S. 328, even though the facts and the application of the principle are widely different, “ the character of the invasion * * * that determines whether it is a taking.”
Had the United States desired to acquire the use of Pier 8 only, and had it known that it was in the possession of the plaintiff as a tenant, it might have commandeered the plaintiff’s leasehold and placed itself practically in the position of a sublessee, with liability to pay rent as just compensation, and the result accomplished, so far as the possession and use of the pier are concerned, would have been the same, but it is not the result alone which determines liability in this class of cases. The result, which is in fact the damage inflicted, must have followed from an invasion of plaintiff’s rights of such a character and under such circumstances as necessarily imply an intention to acquire some property right from the plaintiff and a promise to pay the plaintiff therefor. The mere removal of the plaintiff as an obstacle to the enjoyment of a right otherwise acquired does not measure up to liability upon an implied contract, even though the result, so far as the plaintiff is concerned, may have been the same.
And is it reasonable to assume, as bearing upon the question of intention as a necessary element of an implied contract, that the United States, having specifically requisitioned the Bush Terminal from the Bush Terminal Co. intended to duplicate its procedure in that respect as to each of forty or more tenants by separately requisitioning again *254 from them? If it be said that it was the tenants who held the right to the use of the several portions of these properties embraced in their leases and not the Bush Terminal Co., and that those interests in. its properties which it had committed for a time to others could not be taken from that company, such a condition, if true, could not determine the-action of the United States or put it in the position of having done something which it did not do. If it did not in fact take from the plaintiff such right of occupancy as it. held in Pier 8 under such circumstances as justify the implication of a contract to pay the plaintiff therefor, it is immaterial how it took or what possible wrong it may have inflicted on the plaintiff by the taking, for unless, so far as-this case is concerned, we can raise up an implied contract as between the United States and.this plaintiff, there is nothing for our consideration.
In Johnson's case, 2 C. Cls. 391 and 4 C. Cls. 248, it is held in substance that when the United States occupies the property of another the use and occupation are private property taken for public use, and that the Government is deemed to have entered as a tenant under an implied contract of leasing, Whereof the just compensation secured by the Constitution is the rent, and in Lloyd v. Hough, 1 How. 541, discussing an action in assumpsit for rent necessarily to be founded, on a. contract, express or implied, it is said that the action will not lie when the possession has been acquired under a. different title or where it was tortious, and, in a case cited,, it is said that the action for use and occupation is founded on privity of contract. There was no attempt in the instant, case to acquire possession under the plaintiff’s title. “ Such relationship (landlord and tenant) will never be implied when the acts and conduct of the.parties are inconsistent with its existence.” (142 U. S. 407.)
It may be suggested further that, no contract to pay can be implied as against the United States because of a taking-of property unless the taking was authorized. In the Tempel case, supra, it is said in a footnote that “ Nowhere does-it appear that the Secretary of. War authorized the taking of' the property involved in the suit.” In the Langford case, *255 supra, reference is had to the enforcement of “ valid contracts ” which, it is said, could only be valid as against the United States when made by some officer of the Government acting under lawful authority, with power vested in him to make such contracts. See also United States v. North American Co., 253 U. S. 330-333. Aside from preceding suggestions as to procedure in this matter, it does not appear that anyone having to do with the transaction, so far as the plaintiff is concerned, had any authority to requisition anything from it. The officer serving as General Superintendent of the Army Transport Service was notified by General Goethals, Acting Quartermaster General, that an order had been issued by the President taking possession and assuming control of the Bush Terminal and directing that he (the Superintendent of the Transport Service) “ in conformity with said order ” should take possession of and assume control of the premises. Subsequent proceedings were by subordinates of the Superintendent of the Transport Service and if otherwise than in compliance with instructions to proceed under the general order against the Bush Terminal, as they were not, they were without authority. If, therefore, there was any authorized taking of Pier 8 from the plaintiff, using the word “ taking ” in the sense in which we use it as an element of an implied contract to pay the plaintiff therefor, it must have been because the taking of the whole from the owner necessarily included, but as an additional and separate liability, the taking of a part from a tenant, even though there may have been no knowledge or intent as to the tenant’s interest. We can not assent to the theory .that if the President for war purposes took from the owner the use of a large office building, occupied by many tenants, such a taking became the basis of an additional implied contract as between the United States and each tenant.
It is to be observed that authorities discussing the rights of tenants when made parties defendant in condemnation procedings are not in point. We assume that it is not necessary to discuss essential difference between proceedings in condemnation and cases of this kind.
*256 We suggest a further question which, in view of the conclusion already reached, need not be discussed in detail or, in fact, decided, and that is whether the taking over of the Bush Terminal from the owner did not terminate the leases of the tenants. The taking was for war purposes, authorized under the war power of the President, even though also by statute, to which power the rights of parties under private contracts must be subordinated. In Gates v. Goodloe, 101 U. S. 612, the question decided went only to the liability of lessees to pay rent, but the authorities cited go far toward sustaining the conclusion that in such event private contracts inconsistent with the exercise of a sovereign right are dissolved.
It is now very much in point to refer to the Omnia Commercial Co. v. United States, decided by the Supreme Court on appeal from this court April 9, 1923, 261 U. S. 502, and since our expressions as to the merits of this case were in type before the opinion in the Omnia case reached us, we do not attempt references at appropriate points in this opinion to valuable and pertinent suggestions found in the comprehensive discussion of a similar question in the Omnia case but content ourselves with a general reference thereto, confident that the pertinent points will readily find their application and inferentially, if not directly, lend approval to a part at least of what we have said and sustain the conclusion reached.
Our conclusion must be that the circumstances of the case do not justify the implication of a contract on the part of the United States to pay the plaintiff for the use of the pier in question, and since our jurisdiction to award compensation is dependent upon the ascertainment of an implied contract, and damages may not be awarded on any other basis, it follows that, in accordance with the rulings of the Supreme Court as to proper procedure in such circumstances, the plaintiff’s petition must be dismissed for want of jurisdiction.
Graham, Judge; Hat, Judge; Booth, Judge, and Campbell, Chief Justice, concur.